# STATE OF FLORIDA v. TUCKER

## Case No. 84-4088 CF

Seventeenth Judicial Circuit, Broward County

October 16, 1984

### APPEARANCES OF COUNSEL

**Michael J. Satz,** State Attorney's Office for plaintiff.

**Charles H. Vaughan** for defendant.

### OPINION OF THE COURT

### SENTENCING ORDER

J. LEONARD FLEET, Circuit Judge

Defendant, Allen Wayne Tucker, was indicted by the Grand Jury and charged with two counts of first degree murder and one count of sexual battery. Upon the conclusion of the guilt phase of the trial, Mr. Tucker was deemed to be guilty of second degree murder in reference to Count I and guilty as charged as to Counts II and III.

The advisory jury, being the same group of persons who had decided the issues related to guilt or innocence, recommended to the Court the imposition of the death penalty upon Count II. After several hours of

reflection, and after two weeks of hearing the facts in relation to the matter now before the Court, the Court followed the recommendation of the jury and imposed the death penalty upon the defendant. In addition to the death penalty, the Court directed that the defendant serve consecutive sentences of 99 years of Count I and 30 years upon Count II.

## FACTS UPON WHICH DEATH PENALTY PREDICATED

The testimony received at trial revealed that the decedents, Jonathan Booth and Elizabeth Roberts, were in the company of the parents of Ms. Roberts in the early evening hours of Monday, April 9, 1984. Together the four people enjoyed refreshments at a local ice cream parlor and then returned to the home of Ms. Roberts where a short visit ensued. Soon after returning to their home, Mr. and Mrs. Roberts retired for the evening, leaving the two decedents talking in the front of the house, not to be seen again until their bodies were found.

Apparently, Mr. Booth and Miss Roberts drove to the area of the defendant's house, known as Meekins' Quarry, 5500 Powerline Road, Pompano Beach, riding in a truck owned by Mr. Booth. At a point in time not known precisely, the two decedents parked the truck on the south side of an artificial lake, a lake which had been created largely through the work of the defendant's father during the fourteen years his father worked as a dredge operator for Meekins. All during the time the defendant's father, James Tucker, was operating the dredge in the Meekins' Quarry, the entire Tucker family was living in a house on the land and, as part of the father's job responsibilities, patrolling the area to keep it free of nocturnal trespassers. The patrolling responsibility was, apparently, shared by the various male Tucker children as an assist to James Tucker. The Tucker family also used the premises as a hunting preserve for small game and birds.

The defendant testified that, upon completion of a late night television program, he took a .22 magnum rifle and began a combined patrol of the premises and a hunt for small game. In addition to his rifle, Defendant was armed with a hunter's light designed to attach to his hat and thereby leave his hands free. According to the defendant, his nighttime patrol commenced after midnight of April 9-10, 1984.

While making his way around the manmade lake, the defendant came upon the truck in which Mr. Booth and Ms. Roberts were located. Defendant stated under oath to the jury that he approached the truck from the driver's side, quietly and without the head lamp lit, for the sole purpose of ascertaining who was in the vehicle and to order the occupants off the property. When he was in relatively close

41

distance to the truck, the defendant observed the passenger's door to be open and two nude people were inside, the male lying on top of the female. Defendant called out to the couple engaged in sexual intercourse a couple of times before they responded to his command to exit the truck. When Ms. Roberts and Mr. Booth finally obeyed his orders, they vacated the truck and started yelling at the defendant.

Upset at the fact that the two people in the truck were yelling at him, Mr. Tucker recovered some rope from a pile of trash about 25 feet away from the truck (all the while holdng them at bay by the presence of his rifle) and directed that Ms. Roberts secure the hands of Mr. Booth. Because Mr Booth was still "yelling" at him, Mr. Tucker obtained some adhesive tape commonly utilized in sealing air conditioning ducts and wrapped it around Mr. Booth's head and mouth. At the direction of the Defendant, Ms. Roberts assisted Mr. Booth in returning to the seat of the truck cab, both still completely without clothing excepts for the socks on Mr. Booth's feet.

Once Mr. Booth was back inside the truck cab, Ms. Roberts and the defendant walked around to the driver's side, whereupon Ms. Roberts reentered the truck followed by the defendant. During this period of time, Ms. Roberts had been pleading with Mr. Tucker for freedom for herself and Mr. Booth, all of which pleas were ignored by the defendant.

For reasons not understood even by the defendant, Ms. Roberts was ordered out of the truck and down on to the ground where the defendant then had sexual intercourse with her. The defendant assumes that he ejaculated into the vaginal vault of Ms. Roberts. After the sexual battery was complete, Ms. Roberts was, once again, ordered to return to the inside of the truck and, this time, she was further ordered to write down the names and addresses of herself and Mr. Booth. While complying with this direction, Ms. Roberts continued to plead for the release of herself and her fiance, all to no avail. To stop Ms. Roberts from talking, the defendant fashioned a gag from her brassiere and stuffed it into her mouth, securing it behind her head with the straps.

During the period of time that she was sitting in the truck cab after the sexual battery, Ms. Roberts was seated in the middle of the truck seat, adjacent to Mr. Booth on her right, with the defendant seated, or standing, on her left side. While standing outside the driver's door of the truck, after the sexual battery of Ms. Roberts, Mr. Tucker observed that Mr. Booth had somehow freed one of his hands. Mr. Tucker saw Mr. Booth reach for what was later determined to be a .30 caliber

42

semi-automatic firearm. Mr. Tucker then fired several times in rapid succession towards Mr. Booth, each time having to operate the chamber loading mechanism of his .22 caliber magnum rifle because it was single bolt action. Of the several shots fired into the cab where Ms. Roberts and Mr. Booth were located, one missile entered the back and one entered the leg of Ms. Roberts; another missile entered the chest of Mr. Booth.

For reasons not completely clear in the record, the force of the bullets impacting upon them caused both Mr. Booth and Ms. Roberts to fall out of the truck cab via the driver's side door.

Even though the bullet that struck her in the chest area was sufficient to ultimately cause death, Ms. Roberts did not immediately die but, rather, she fell to the ground and began to moan. Defendant, after he had initially shot the two young people, walked around to where the injured persons were lying and fired one more bullet into the back of Ms. Roberts in the general vicinity of her heart. The reason given by the defendant for the final shot leveled at Ms. Robers was ". . . to shut her mouth." The efforts of the defendant were extremely successful.

The killing of the two victims completed, the defendant then engaged in activity that he thought would cover up his handiwork. Defendant removed several knives and the .30 caliber rifle from the truck and threw them into the lake dug by his father. Later, the defendant's .22 caliber magnum rifle was similarly deposited in a watery grave.

## AGGRAVATING FACTORS

The facts summarized above, and none else, are those relied upon by the Court in ordering that the death penalty be imposed upon the defendant in this case, pursuant to the mandate of Florida Statute 921.141.

1. The accused was not under sentence of imprisonment at the time the events herein described occurred; therefore, F.S. 921.141(5)(a) does not apply.

2. At the time of the imposition of sentence in this cause, the defendant had been convicted of two crimes of violence, to-wit: the second degree murder of Mr. Booth and the sexual battery of Ms. Roberts. It is found, therefore, that the aggravating circumstance set forth in F.S. 921.141(5)(b) has been established beyond a reasonable doubt.

3. There is no evidence that the defendant knowingly created a great

**43**

risk of death to many persons, as that aggravating circumstance is contemplated by F.S. 921.141(5)(c).

4. The capital felony was committed after the defendant had committed the crime of sexual battery upon Ms. Roberts and was about to engage in flight therefrom, thereby establishing the aggravating factor set forth in F.S. 921.141(5)(d).

5. The sexual battery of Ms. Roberts was complete before the first shot was fired by Mr. Tucker. Once Mr. Booth and Ms. Roberts had been shot and fallen to the ground on the passenger's side of the truck, Mr. Tucker then calmly walked around to where they lay and fired another round into the back of Ms. Roberts. Such action on the part of the accused was taken for the purpose of avoiding or preventing any arrest that may have occurred had Ms. Roberts survived the initial shooting. The Court finds, therefore, that the aggravating circumstance contemplated by F.S. 921.141(5)(e) has been established beyond a reasonable doubt.

6. There is no evidence that the killing of either of the persons named in the indictment was for pecuniary gain and, therefore, this aggravating circumstance (as defined by F.S. 921.141(5)(g)) is deemed not to be applicable to the case at bar.

7. The capital felony, from the evidence before the Court, was not especially heinous, atrocious or cruel as required for the application of F.S. 921.141(5)(h).

8. There is sufficient evidence before the Court that Ms. Roberts was shot in the back after the defendant had ample opportunity to reflect upon what he had done and was about to do. The shot into the back of Ms. Roberts as she lay upon the ground, moaning in pain, more than adequately supports the conclusion that the capital felony was committed in a cold, calculated and premeditated manner without any pretense of moral or legal justification, thus establishing the presence of the aggravating circumstances set forth in F.S. 921.141(5)(i).

## MITIGATING CIRCUMSTANCES

The mitigating circumstances include the relative youth of the defendant at the time of the capital felony. When these tragic events occurred, Mr. Tucker was no more than 23 years old, just about the same age as that of his victims. During his short life, Mr. Tucker has not developed any significant criminal record. The Court wonders if the relatively clean record of the accused is due to his knowing not to violate the law or his refusal to venture out into the world outside of the Meekins' Quarry where he had resided since he was nine years old.

44

The record contains absolutely no evidence that suggests that Mr. Tucker, at the time he committed the crimes of which he now stands convicted, was under the influence of any extreme mental or emotional disturbance.

Although it does not appear as though Ms. Roberts put up a violent resistance to the sexual battery perpetrated upon her by Mr. Tucker, there is certainly no evidence that she either participated in the defendant's conduct nor did she consent to the act of sexual intercourse forced upon her by the defendant.

The defendant was the sole actor in said sad event and must bear the full responsibility therefor. There is absolutely no way in which the defendant can claim that he played only a minor role in these sordid events, thereby eliminating from consideration the mitigating factors described in F.S. 921.141(6)(d) and (e).

In addition to the statutory mitigating factors to be considered in the weighing of whether to impose the maximum penalty of death, the Court has taken into consideration the positive side of the defendant. Mr. Tucker possesses a great deal of affection for his family, particularly his father and mother. He has always been of assistance to his mother by doing numerous chores around the house and, generally, has been a good son to her. Mr. Tucker rendered assistance, however small it may have been, to his father in his patrolling of the Meekins' Quarry property; such patrol duty gave his father the opportunity to rest more at night after working days that often lasted 12 or 14 hours.

Mr. Tucker would baby sit for his sister's children and tried to teach them the techniques of fishing and hunting that had been passed on to him by his father. Such activities were, certainly, in keeping with a law abiding person regardless of socio-economic status in life.

## CONCLUSION

Balancing all of the aggravating and mitigating factors, as required by law, and upon comparison of this case with the penalty imposed in other cases of a similar nature, the Court is of the opinion that justice, law and duty require the imposition of the death penalty. The aggravating circumstances greatly outweigh the mitigating circumstances in the matter now before the Court. The jury recommended death and the Court is in accord with such recommendation.

It is, therefore,

ORDERED and ADJUDGED, THAT Allen Wayne Tucker shall be remanded to the custody of the Sheriff of Broward County for trans-

**45**

port to the Florida Department of Corrections, there to be held until such time as the Governor of the State of Florida shall direct, in writing, that a death warrant be issued in this case. Upon the issuance of a lawful death warrant by the said Governor, the Warden of the Department of Corrections shall cause to pass through the body of Allen Wayne Tucker a current of electricity sufficient to cause death, all in accordance with the law of the State of Florida.

This order is entered for the purpose of reducing to writing the pronouncement made in open court on September 22, 1984 at 2:15 P.M., at Fort Lauderdale, Broward County, Florida.